UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

RAMON ANTONIO MORAN,

        *Plaintiff,*

  – against –

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

        *Defendant.*

**MEMORANDUM & ORDER**
24-cv-08153 (NCM)

---

**NATASHA C. MERLE**, United States District Judge:

Plaintiff Ramon Antonio Moran brings this action against defendant Commissioner of the Social Security Administration ("Commissioner") seeking judicial review of the Commissioner's decision on plaintiff's application for disability insurance benefits and supplemental social security income benefits. Compl. ¶¶ 1, 4, 6, 8, ECF No. 1. Before the Court is plaintiff's motion for judgment on the pleadings ("Motion"), ECF No. 10-1, and the Commissioner's cross-motion for judgment on the pleadings ("Cross-Motion"), ECF No. 12-1. For the reasons stated below, plaintiff's Motion is **GRANTED**, and the Commissioner's Cross-Motion is **DENIED**.

## BACKGROUND

### I.    Factual Background

Plaintiff is a middle-aged man from the Dominican Republic. *See* R. 60, ECF No. 7; *see also* Joint Stipulation of Relevant Facts ("Joint Stip.") ¶ 45, ECF No. 14.[1] Plaintiff

---

[1]    Throughout this Order, page numbers for the Certified Administrative Record ("R.") refer to the numbers found in the bottom right corner of each page, rather than the

moved to the United States and worked in maintenance and as an airplane cleaner from 1994 to October 2016. R. 60, 251; *see also* Joint Stip. ¶ 45. On October 24, 2016, plaintiff went to an emergency room seeking treatment for neck pain, fever, nausea, frequent headaches, and knee pain. Joint Stip. ¶ 2. Two weeks later plaintiff returned to the emergency room seeking treatment "for generalized weakness and left knee pain over the previous few weeks." Joint Stip. ¶ 3. Hospital staff conducted an electrocardiogram ("EKG") that showed plaintiff had a rapid heart rate and an abnormal white blood cell count, but staff otherwise did not detect any infectious diseases. Joint Stip. ¶ 3. On November 16, 2016, plaintiff visited his primary care physician with complaints of fatigue, general weakness, knee pain, and malaise. Joint Stip. ¶ 4. Plaintiff's physician detected that plaintiff's blood pressure was very low and that he had jaundice, so plaintiff was sent to the emergency department. Joint Stip. ¶ 4.

Upon admittance to the emergency department, plaintiff was diagnosed with sepsis. Joint Stip. ¶ 4. Diagnostic tests showed that plaintiff had several infections, blockages, and severe damage in his brain, heart, and lungs. *See* Joint Stip. ¶ 4. A few days after being admitted plaintiff was diagnosed with, among other things, mitral valve endocarditis, "an infection of the heart [that] can cause rapid, severe damage to the heart valves." Joint Stip. ¶ 5 n.11. On November 29, 2016, plaintiff underwent open-heart surgery, which involved the replacement of two heart valves. Joint Stip. ¶ 7. Following the procedure plaintiff was diagnosed with "aortic valve and mitral valve disease, severe mitral insufficiency, and endocarditis." Joint Stip. ¶ 7.

---

page numbers assigned by the Electronic Case Filing system ("ECF"). All other page numbers for docket filings refer to the page numbers assigned by ECF.

Plaintiff was discharged from the hospital about one week later. Around that time, plaintiff's cardiac surgeon provided a letter stating that plaintiff was "unable to return to work at th[at] time" due to his extensive hospital stay and cardiac surgery. Joint Stip. ¶¶ 10–11; *see also* R. 600. Plaintiff was seen in a cardiology clinic shortly thereafter where he "denied chest pain, shortness of breath, palpitation, lightheadedness, headaches, and dizziness," but nevertheless was prescribed oxycodone to alleviate discomfort. Joint Stip. ¶ 12.

Then, on February 6, 2017, plaintiff underwent a thoracic endovascular aortic repair ("TEVAR") procedure. Joint Stip. ¶ 13. However, the TEVAR procedure led to complications, specifically, insufficient blood flow to plaintiff's organs and legs. Joint Stip. ¶ 13. This necessitated open fenestration surgery—a "more invasive, open-chest surgery" used as an alternative to TEVAR—to restore blood flow. Joint Stip. ¶ 13 n.23. During this procedure surgeons discovered a "new Type A aortic dissection," i.e., a tear in the inner layer of the aorta—but "further surgery was halted as the surgeons estimated plaintiff would not tolerate major aortic surgery." Joint Stip. ¶ 13. Instead, surgeons "packed" the wound, and plaintiff was transferred to the intensive care unit ("ICU") in critical condition. Joint Stip. ¶ 13.

## II. Medical Evidence

Relevant to the parties' current dispute, the administrative record of plaintiff's benefits proceedings includes two consultative examinations conducted in connection with plaintiff's disability application, as well as testimony from plaintiff and a medical expert at hearings before the Administrative Law Judge ("ALJ").

3

### A. *Consultative Examinations*

#### 1. Dr. Paulvin's Report

On February 24, 2017, a few weeks after plaintiff's second heart surgery, plaintiff was evaluated by Dr. Paulvin, a consultative examiner who specialized in family medicine. Joint Stip. ¶ 14; *see also* R. 606. The report notes that plaintiff suffered from hypertension since 2005, and that plaintiff had "surgery on an infection in his valve done in November 2016." R. 606. In the "past history" section of the report, Dr. Paulvin indicates that plaintiff "was hospitalized in November 2016 at New York Presbyterian Hospital for the cardiac surgery." R. 606. The report does not mention the February 2017 surgery and emergency hospitalization. *See* R. 606–08.

The report indicates that plaintiff's prognosis was "good." R. 608. Dr. Paulvin opined that plaintiff was "limited just by the pain he has when he lifts, secondary to his surgery," but that such pain was "not reproducible." R. 608. The report further states that plaintiff denied chest pain or shortness of breath, and that plaintiff's "[p]ulmonary, abdominal, neurologic and musculoskeletal findings were all normal." Joint Stip. ¶ 14. Dr. Paulvin further noted that plaintiff was able to cook, shop, shower, and dress himself, but that he could not clean or do laundry due to problems with bending and pain from his surgery. Joint Stip. ¶ 14.

#### 2. Dr. Meisel's Report

Dr. Allen Meisel, another consultative examiner for the SSA, evaluated plaintiff on July 31, 2018. Dr. Meisel's report also indicated that plaintiff was hospitalized in 2016, because he "apparently had endocarditis." R. 1884. Dr. Meisel noted that plaintiff had an aortic valve replacement in November 2016, but—just like Dr. Paulvin's report—omitted any mention of the February 2017 surgery. *See* R. 1884–87. Dr. Meisel opined that

4

plaintiff's prognosis was "fair." R. 1886. Dr. Meisel further opined that plaintiff had "marked limitations of heavy lifting and carrying," as well as "climbing ladders, scaffolds, and being exposed to unprotected heights." R. 1886. The report indicated that "[b]ecause of [plaintiff's] cardiac status[,] [h]e should avoid activities which are mildly or moderately strenuous." R. 1886. Dr. Meisel also noted that plaintiff had limitations with standing, walking, bending, kneeling, and climbing. R. 1886.

### B. *Testimony*

#### 1. Plaintiff's Testimony

At a hearing before the ALJ on March 13, 2019, plaintiff testified that he worked various jobs in maintenance and janitorial work prior to his first heart surgery. R. 29–30. Plaintiff testified that for the five months following surgery, nurses would come to his house to give him antibiotics to treat his sepsis. *See* R. 32. Although plaintiff testified that his condition gradually improved, he also testified that he had significant chest pain from the surgery. *See* R. 32–33. Specifically, plaintiff testified that on a scale of zero to ten, with ten "being the worst pain in the world," his pain "was at 10" at the incision point from his surgery. R. 33. Plaintiff explained that this pain slowly subsided, but it did not go away until "March or February of 2018." R. 33–34. Plaintiff further testified that, as of the date of the hearing, he could not stand for long periods of time, and that he believed his difficulties standing stemmed from his heart problems. R. 35.

Plaintiff testified again at a November 9, 2022 hearing before the ALJ. Plaintiff testified that he had "numbness" in his legs since his surgery. R. 1942. The ALJ asked plaintiff's counsel at the hearing, Mr. Farhi, whether there were any clinical reports reflecting leg numbness in the record, which led to the following exchange:

> ALJ: Yes. Is it any place in the clinical records, is what I'm looking for, sir?
>
> FARHI: Very well. Was we -- clinical records are sparse, shall we say, on this case. But I think (INAUDIBLE) is that assessment.
>
> ALJ: Sparse? Sparse? There's 1,796 pages. Do you consider that sparse evidence, Mr. Farhi?
>
> FARHI: Excuse me?
>
> ALJ: You said the medical evidence is sparse. There's 1,796 pages.
>
> FARHI: Well, he has a very serious heart condition. And he went through a lot of procedures in 2017.
>
> ALJ: 2016.
>
> FARHI: Since then, I don't know how –
>
> ALJ: 2016, sir.
>
> FARHI: 2016.
>
> ALJ: Yes, Sir.
>
> FARHI: Well, the operation --
>
> ALJ: But anyway, it's your witness. If you think the record is sparse — you think it's sparse. I think 1,700 pages is pretty significant. But please go ahead. You may continue asking your questions to the claimant.

R. 1944–45.

Following this exchange, plaintiff testified that it took approximately one year and four months to recover from his February 2017 surgery. R 1946. He explained that although some people heal quickly following open-heart surgery, in his case, "it took a while for [him] to recover." R. 1947. Plaintiff also explained that his doctors instructed him not to lift anything heavy. *See* R. 1948–49. Plaintiff was asked whether he might need

another surgery given that his second surgery was aborted, and he was in severe condition at the time, but plaintiff testified that he did not know if he needed another surgery because his doctor "had not told [him] anything yet." R. 1948.

*C.  Dr. Jilhewar Testimony*

At the March 2019 hearing, Dr. Ashok Jilhewar testified as a medical expert. R. 38. Dr. Jilhewar testified that he was board certified in internal medicine and gastroenterology, and that he had treated patients with severe heart conditions, "but not one like [plaintiff]." R. 38. Dr. Jilhewar then testified as to his review of the medical records in the case. Specifically, he recounted the events leading up to plaintiff's first open-heart surgery in November 2016. R. 40–42. Dr. Jilhewar explained that shortly after plaintiff was discharged from the hospital, he "developed dissection of aorta . . . in the chest cavity." R. 42. Relying on the operating report from the February 6, 2017 procedure in the record, Dr. Jilhewar observed that plaintiff "required second surgery to try to correct the effects" of the dissection of the aorta, but that "post-operative recovery was . . . uneventful" because Dr. Paulvin's report indicated that plaintiff "recovered by the time of consultative examination." R. 42–43. Dr. Jilhewar opined that plaintiff had a "sedentary" residual functional capacity ("RFC") once he recovered from his surgery. Joint Stip. ¶ 50; *see also* R. 43.

Dr. Jilhewar also testified as to plaintiff's recovery from the surgeries. Specifically, he testified that at the time of the hearing plaintiff had "recovered except for the pain at the site of the incision." R. 43. He explained that it normally takes six months to recover from a heart operation like plaintiff underwent, but that he could not confirm plaintiff's recovery timeline because he "did not find . . . documentation of the cardiac rehab" in the record. R. 44. The ALJ asked Dr. Jilhewar whether there was any indication that plaintiff

suffered "any sort of chest pain that might prevent work activity[.]" R. 45. Dr. Jilhewar explained that he would "expect" that one year after the second surgery plaintiff "should be able to do . . . light physical work unless documented." R. 46. However, Dr. Jilhewar noted that he did "not have . . . documentation one year after the second surgery." R. 45.

After the ALJ's questioning, plaintiff's counsel asked Dr. Jilhewar questions pertaining to plaintiff's condition and recovery. Notably, when asked about plaintiff's heart disorders and the nature of his surgeries, Dr. Jilhewar testified: "[T]he operation was very extensive, life-threatening, and [plaintiff] has recovered miraculously, much more faster [sic] than I would have expected." R. 50. He further testified that a hypothetical person who went through plaintiff's procedure would be expected to have post-traumatic stress disorder, but Dr. Jilhewar did "not have documentation" to confirm as such in plaintiff's case. R. 50.

### III.   Procedural Background

Plaintiff applied for disability insurance and supplemental security income benefits on January 27, 2017. R. 212. Plaintiff listed eight conditions as the basis for his application: (1) presence of [a] prosthetic heart valve; (2) bacteremia; (3) sepsis; (4) s[ep]tic arterial embolism; (5) nontraumatic mitral; (6) subarachnoid hemorrhage; (7) high blood pressure; and (8) hypertension. R. 251. The ALJ held a hearing on March 13, 2019, at which plaintiff; Dr. Jilhewar—a medical expert; and a vocational expert testified. Joint Stip. 1. By decision dated May 30, 2019, the ALJ found that plaintiff was not disabled for purposes of SSA regulations. Joint Stip. 1. The ALJ concluded that although plaintiff "had been very ill, . . . his condition did not last the required 12-month period to establish disability, and by July 2017, [plaintiff] could perform basic work activities." R. 92. Plaintiff requested and was granted review of the ALJ's decision by the SSA Appeals

8

Council. Joint Stip. 1. The Appeals Council found that there was an error of law in the ALJ's decision, specifically because the ALJ had "requested and received [a] consultative examination report prior to the scheduled hearing and it was not exhibited or entered into the record." R. 206. The Appeals Council also concluded, contrary to the ALJ's conclusion, that plaintiff's "history of endocarditis status post heart surgery was a severe impairment." R. 207. Nevertheless, the Appeals Council adopted the ALJ's determination of plaintiff's RFC and thus concurred that plaintiff was not disabled for purposes of the Social Security Act. *See* R. 207.

Plaintiff appealed the decision to this district on November 3, 2020. Joint Stip. 1; *see also Moran v. Comm'r of Soc. Sec.*, No. 20-cv-05313 (E.D.N.Y. filed Nov. 3, 2020). By joint stipulation the parties agreed to reverse and remand the ALJ's decision on the grounds that the ALJ "did not properly consider the evidence in finding that [p]laintiff was not disabled within the meaning of the Social Security Act." *Moran*, ECF No. 22-1 at 1. The parties agreed that on remand defendant would, among other things, "offer [p]laintiff the opportunity for a new hearing, take further action to complete the administrative record, and issue a new decision." *Moran*, ECF No. 22-1 at 1.

On remand, the same ALJ held hearings on August 11, 2022, and November 9, 2022. Joint Stip. 2. Plaintiff and another vocational expert testified. Joint Stip. 2. By decision dated December 5, 2022, the ALJ issued a partially favorable decision, finding that plaintiff was disabled on October 14, 2022, "the day his age category changed to an individual of advanced aged," but also finding that plaintiff was not disabled prior to that date. Joint Stip. 2. The Appeals Council affirmed the ALJ's decision on September 26, 2024, and plaintiff filed the instant appeal on November 25, 2024. Compl. ¶ 7.

## STANDARD OF REVIEW

A district court reviewing a final decision of the Commissioner is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see* Fed. R. Civ. P. 12(c) (allowing courts to enter a judgment on the pleadings). Nonetheless, federal judicial review is "limited." *Rubin v. Martin O'Malley, Comm'r of Soc. Sec.*, 116 F.4th 145, 154 (2d Cir. 2024).[2] Reviewing courts "do not substitute" their own "judgment for the agency's" or review the record de novo. *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012). Instead, "[w]e conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Rubin*, 116 F.4th at 154.

In conducting this review, courts must determine (1) "whether the correct legal standards were applied," and (2) "whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Rucker v. Kijakazi,* 48 F.4th 86, 90–91 (2d Cir. 2022). Whether the record contains "substantial evidence" depends on whether "a reasonable mind might accept" the evidence "as adequate to support" the ALJ's determination. *Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019) (explaining that "[t]he phrase 'substantial evidence' is a 'term of art' used throughout administrative law to describe how

---

[2]    Throughout this Order, the Court omits all internal quotation marks, footnotes, and citations, and adopts all alterations, unless otherwise indicated.

courts are to review agency factfinding"). The "threshold for such evidentiary sufficiency is not high"; it requires only that the record contain "more than a mere scintilla" of evidence. *Id.* at 103. The court must uphold the Commissioner's conclusion so long as it is supported by a "rational interpretation" of the evidence. *Rubin*, 116 F.4th at 155. However, courts must still "examine contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.*

"Before determining whether the Commissioner's final decision is supported by substantial evidence[,] the court must first be satisfied that the ALJ completely developed the administrative record." *Kelly v. Comm'r of Soc. Sec.*, No. 20-cv-05318, 2024 WL 5120051, at *9 (E.D.N.Y. Dec. 16, 2024). The ALJ has a "well-established" obligation to investigate and develop the record, even where a claimant is counseled—this "has been described as a bedrock principle of Social Security law." *Id.* Accordingly, where the presiding ALJ did not apply the correct legal standard or sufficiently develop the record, a court may remand the case for further proceedings. *See Sczepanski v. Saul*, 946 F.3d 152, 162 (2d Cir. 2020); *Daniels v. Kijakazi*, 617 F. Supp. 3d 180, 195 (S.D.N.Y. 2022).

## DISCUSSION

### I.    Statutory and Regulatory Disability Benefit Requirements

The SSA administers social security disability insurance benefits to eligible applicants pursuant to the Social Security Act. *See generally* 42 U.S.C. § 301 *et. seq.* To secure benefits, an applicant must demonstrate, among other things, that he is disabled: that his impairment or combination of impairments renders him unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

11

42 U.S.C. § 423(d)(1)(A). The Commissioner, acting through a presiding ALJ, assesses whether an applicant meets the statutory definition of disabled by undertaking a "five-step sequential evaluation process." 20 C.F.R. § 404.1520(a)(4). The Commissioner only advances to the next step where a determination of an applicant's disability status cannot be made at that stage. *Id.*

The first step is to evaluate the applicant's work activity; a disability determination will be denied where an applicant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). At the second step, the Commissioner "considers the medical severity of the claimant's impairment or combined impairments." *Rubin*, 116 F.4th at 147 (citing 20 C.F.R. § 404.1520(a)(4)(ii)). The third step is a determination on whether the applicant's impairments "meets or equals" one of the listings in Appendix 1 of Part 404, Subpart P ("Subpart Listed Impairment"). 20 C.F.R. § 404.1520(a)(4)(iii). If the applicant's impairments do not meet or equal a Listed Impairment, the Commissioner determines the claimant's RFC, which is the claimant's ability to function in a workplace despite medical limitations and "based on all the relevant medical and other evidence in [the] case record." 20 C.F.R. § 404.1520(e). At step four, the Commissioner assesses whether the claimant can perform past relevant work when considering the claimant's RFC. 20 C.F.R. § 404.1520(a)(4)(iv).

If the claimant cannot perform his past relevant work, the fifth and final step is to consider whether an applicant, given his RFC, age, education, and work experience, can perform other work. 20 C.F.R. § 404.1520(a)(4)(v). The claimant "bears the burden of proof in the first four steps of the sequential inquiry." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013). However, at step five, "the burden shifts, to a limited extent, to the

12

Commissioner to show that other work exists in significant numbers in the national economy that the claimant can do." *Rubin*, 116 F.4th at 148.

## II.    The ALJ's Determination

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since September 30, 2016. R. 1914. At step two, the ALJ found that plaintiff suffered from two medically severe impairments: endocarditis stats post-surgery and obesity. R. 1914. The ALJ also noted that plaintiff was diagnosed with hypertension and suffered from high cholesterol and tension headaches, although none of these conditions amounted to medically severe impairments. R. 1914. At step three, the ALJ concluded that plaintiff's obesity and endocarditis did not meet or equal the severity of a Subpart Listed Impairment. R. 1914. In reaching this conclusion the ALJ "gave particular attention" to the cardiovascular system impairment included as a Subpart Listed Impairment, R. 1915; *see* Subpart Listed Impartment 4.00, but reasoned that plaintiff's "impairments were not severe enough, for long enough, to meet or medically equal any listing," R. 1915. The ALJ reasoned that plaintiff was "very ill from October 2016 through February 2017, but by July 2017 he was stable." R. 1915. Therefore, in the ALJ's view, plaintiff "did not have significant symptoms, approaching [a Subpart Listed Impairment] level, for a period of at least 12 continuous months." R. 1915.

The ALJ then assessed plaintiff's RFC and concluded that plaintiff had the RFC to "perform light work," except that plaintiff could only occasionally "stoop, kneel, crouch, and crawl." R. 1915. The ALJ found that plaintiff could not reach overhead but could reach at a desk. R. 1915. The ALJ opined that plaintiff should be "expected to be off task 9% of the workday." R. 1915. In reaching these findings the ALJ explained that she must follow a two-step process in which she first was required to determine if there was an "underlying

13

medically determinable physical or mental impairment(s)" that could "reasonably be expected" to produce plaintiff's pain or other symptoms. R. 1915. Then, at step two of the process, the ALJ stated that she was required to evaluate the "intensity, persistence, and limiting effects" of plaintiff's symptoms to ascertain how those symptoms impacted plaintiff's work-related activities. R. 1915. In doing so, the ALJ noted that if statements about the limiting effects of plaintiff's pain and other symptoms were not "substantiated by objective medical evidence," then she must "consider other evidence in the record to determine if [plaintiff's] symptoms limit the ability to do work-related activities." R. 1915.

The ALJ concluded at step one that plaintiff did have medically determinable impairments that could reasonably be expected to cause some of the alleged symptoms. R. 1916. However, at step two, the ALJ found that plaintiff's statements concerning the limiting effects of his symptoms were "inconsistent" and were "not fully supported by the medical evidence" in the record. R. 1916. The ALJ also opined that plaintiff's allegations concerning his symptoms were "not fully in line" with his "reported activities of daily living." R. 1916. The ALJ compared plaintiff's statements concerning his pain, symptoms, and activities of daily living as set forth in his disability application with medical evidence in the record. R. 1915–16 (citing R. 250, 258). The ALJ turned to a series of hospital and medical examination records spanning from October 24, 2016 through January 20, 2022 and found that "[i]t [wa]s clear that from October 2016 through February 2017, the claimant was very ill[,]" but that "by July 19, 2017, the claimant was feeling better and was stable." R. 1916. Additionally, the ALJ weighed various medical opinion evidence in the record, including evidence from plaintiff's treating physician, the Commission's independent consultative examiners, and medical expert testimony at the November 2019 hearing. R. 1917–18.

The ALJ reasoned that the record evidence supported the conclusion that plaintiff had the RFC to perform light work with certain limitations. R. 1919. The ALJ noted that her conclusion regarding plaintiff's RFC "t[ook] into account [plaintiff's] heart disease by limiting him to light work with no overhead lifting." R. 1919. The ALJ also explained that she accounted for plaintiff's reports of dizziness, headaches, and shortness of breath by "limiting [plaintiff] from working at heights or ladders," as well as plaintiff's "[o]ff-task limitation." R. 1919.

At step four, the ALJ concluded that plaintiff's RFC did not permit him to perform his past relevant work as a janitor, airplane cleaner, and industrial cleaner. R. 1919; *see also* Joint Stip. 3. At step five, the ALJ found that beginning on October 14, 2022—when plaintiff turned fifty and his age category for purposes of SSA regulations changed to an individual of advanced age—no jobs existed in significant numbers in the national economy that plaintiff could perform based on his age, education, work experience, and RFC. R. 1919–21, *see* Joint Stip. 3. However, the ALJ concluded that prior to October 14, 2022—when plaintiff was in a younger age category—there were jobs that plaintiff could perform. Relying on the testimony of the vocational expert, the ALJ determined that plaintiff could perform jobs such has a produce weigher, collator, small products assembler, and line service attendant. R. 1920–21. Thus, the ALJ reasoned that plaintiff "was not disabled prior to October 14, 2022, [but] became disabled on that date" for purposes of the Social Security Act. R. 1921–22.

### III.    The Court's Analysis of the ALJ's Determination

Plaintiff appeals the ALJ's decision on several grounds. As a threshold matter, plaintiff asserts that the ALJ failed to fully develop the record. Mot. 12. In particular, plaintiff notes that the there is only a single document—the operating report—in the

15

record reflecting plaintiff's emergency heart surgery in February 2017. Mot. 12. Plaintiff notes that this surgery was "aborted," and that he was "transferred to the ICU in critical condition to await another open-heart surgery." Mot. 12. Yet, according to plaintiff, "[t]here are no other records of this hospitalization," thus amounting to a "glaring gap in the evidentiary record." Mot. 12. Next, plaintiff argues that the ALJ misapplied the legal standard when evaluating plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms. Mot. 7–12. Specifically, plaintiff argues that the ALJ did not carry out the proper analysis in conducting the two-step credibility inquiry, including because she failed to "clearly articulate[]" any "specific reasons" why plaintiff's statements concerning his symptoms were unsupported or otherwise inconsistent with his activities of daily living. Mot. 12 (quoting *Castel v. Saul*, No. 19-cv-05180, 2020 WL 5775668, at *19 (S.D.N.Y. Sep. 1, 2020)). Finally, even based on the evidence in the record, plaintiff contends that the ALJ still erred because (1) she failed to properly evaluate the medical opinion evidence, Mot. 16; (2) her RFC finding was not supported by substantial evidence, Mot. 22; and (3) she improperly relied on the vocational expert's testimony, Mot. 25.

### A. Developing the Record

"[T]he ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). This duty "arises from the Commissioner's regulatory obligations to develop a complete medical record before making a disability determination[.]" *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (citing 20 C.F.R. § 404.1512(d)–(f) (1995)); *see also Morris v. Berryhill*, 721 F. App'x 25, 27 (2d Cir. 2018) (summary order) ("The social security ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding."). Although this duty is heightened when

16

a claimant proceeds pro se, it "exists even when, as here, the claimant is represented by counsel." *Pratts*, 94 F.3d at 37. While it is true that the affirmative duty to expand the record does not extend ad infinitum, reasonable efforts must be made to seek out further information where evidentiary gaps exist, or where the evidence is inconsistent or contradictory. *Cadet v. Colvin*, 121 F. Supp. 3d 317, 320 (W.D.N.Y. 2015).

Plaintiff contends that the ALJ did not attempt to "fill the[] gaps in the evidentiary record" related to plaintiff's rehab following his second heart surgery. Mot. 13. Despite numerous documents in the record about plaintiff's first heart surgery in November 2016, the operative report of the February 2017 procedure is "the only document of that event in the record." Mot. 12. Moreover, "no other records" reflect that this procedure was aborted, and that plaintiff was hospitalized shortly thereafter in critical condition. *See* Mot. 12. Plaintiff notes that the consultative examiners and medical expert who opined on plaintiff's medical condition were seemingly either unaware of the second surgery and hospitalization or indicated that they "would have liked to see treatment notes" following the second surgery "to better evaluate the situation." Mot. 12–13. Plaintiff attempted to point out to the ALJ that records covering this period of his rehab were "sparse." Mot. 13. However, "the ALJ expressed skepticism because the record was, at the time, over 1700 pages." Mot. 13 (citing R. 1944). Plaintiff argues that this failure was particularly prejudicial because "the lack of records from [plaintiff's] cardiac rehabilitation after his February 2017 surgeries ma[d]e it difficult to evaluate" whether plaintiff had a Subpart Listed Impairment. Mot. 14. That is, in the absence of the rehab records, the ALJ was unable to determine if plaintiff was statutorily disabled. *See* Mot. 14–15.

Defendant disputes plaintiff's characterization of the proceedings below and the factual record on multiple fronts. First, defendant argues that plaintiff's reliance on the

2019 hearing to suggest that the record was incomplete is "disingenuous." Cross-Mot. 14. Defendant points out that after that hearing plaintiff submitted almost 200 pages of medical records, some of which included "additional cardiac findings from [plaintiff's] own doctors" that supported the ALJ's conclusion as to plaintiff's condition. Cross-Mot. 14. In a similar vein, defendant contends that plaintiff submitted a supplemental brief prior to the November 2022 hearing, but plaintiff did not "mention[] any outstanding records or suggest[] that further evidentiary development was needed." Cross-Mot. 15. Relatedly, defendant raises arguments pertaining to plaintiff's representation during the proceedings, including that (1) plaintiff's counsel below "represented [that] the record was complete" during the November 2022 hearing; and (2) to the extent that further record development was needed, "the time to raise that issue was before the ALJ; counsel cannot let the issue pass [and] see what the result of the hearing is, and then raise the issue when the decision turns out to be adverse." Cross-Mot. 18–19 (quoting *Richard R. v. Comm'r of Soc. Sec.*, No. 23-cv-06346, 2024 WL 4064084, at \*5 (W.D.N.Y. Sept. 5, 2024)). Defendant further argues that any failure to develop the factual record was not prejudicial because (i) plaintiff only "speculates that there are additional treatment notes that were not part of the record," Cross-Mot. 15; and (ii) any additional records about the February 2017 surgery "would be of negligible probative value" because the ALJ "acknowledged that [p]laintiff was very ill during this period." Cross-Mot. 18. These arguments are unavailing.

To begin, defendant's suggestion that plaintiff conceded that the record was complete based on counsel's representations during the underlying benefit hearing is without merit. An ALJ's obligation to develop the record arises from the "non-adversarial nature" of benefits proceedings. *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508–09

18

(2d Cir. 2009). Thus, "[i]t is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits." *Butts*, 388 F.3d at 386. As such, an ALJ's "affirmative obligation to develop the record . . . cannot be relieved . . . by a statement of counsel." *Santoro v. Comm'r of Soc. Sec.*, 703 F. Supp. 3d 376, 388 n.6 (E.D.N.Y. 2023); *see also Francis v. Comm'r of Soc. Sec.*, No. 20-cv-04619, 2021 WL 3129873, at *3 (E.D.N.Y. July 23, 2021) ("[A] claimant's representation by counsel before the ALJ does not absolve the ALJ of his obligation to develop the record."). Therefore, the fact that plaintiff's counsel "represented that the record was complete[,]" Cross-Mot. 15, at the beginning of the November 2022 hearing did not relieve the ALJ of her duty to develop the record. This is particularly so given that counsel attempted to explain that there were "sparse" clinical records about the February 2017 surgery later during that same hearing. *See* R. 1944; *see also Santoro*, 703 F. Supp. 3d at 388 n.6 (rejecting Commissioner's argument that the claimant's attorney's "agree[ment] that the record was complete" relieved the ALJ of the duty to develop the record where "that statement came at the very beginning of the hearing . . . before the attorney raised" issues with the record).

Next, defendant asserts that plaintiff's reliance on the March 2019 hearing to support his argument that the record was incomplete is "disingenuous" because plaintiff "subsequently submitted nearly 200 pages of medical records." *See* Cross-Mot. 14. The Court disagrees. To be sure, plaintiff did submit additional medical records in connection with his supplemental brief in advance of the November 2022 hearing, *see* R. 2213–2419, some of which the ALJ relied on in support of her conclusion that plaintiff was not disabled for purposes of the SSA, *see* R. 1917. But as plaintiff argues, those records document plaintiff's treatment years after his February 2017 surgery and thus "d[o] not fill the lack [of records] identified by the [medical expert], nor include records of

19

Mr. Moran's surgery for his second Type A aortic dissection." Reply 4; *see also* R. 2228, 2297, 2298, 2325, 2335. More importantly, the supplemental records did not discharge the ALJ of her duty to develop the factual record because that duty not only obligates an ALJ to obtain medical records, but also to "obtain[] a consultative examination, re-contact[] a medical source, or hav[e] an expert testify at the hearing" where necessary to complete the record and afford the claimant a full and fair hearing. *Golden v. Saul*, No. 18-cv-06803, 2020 WL 3248821, at *6 (W.D.N.Y. June 16, 2020); *see also Estella v. Berryhill*, No. 15-cv-06966, 2017 WL 2693722, at *22 (S.D.N.Y. June 22, 2017) (explaining that the requirement that a benefit hearing be "full and fair . . . is derived from the ALJ's affirmative duty to develop the record"); *accord Sarago v. Shalala*, 884 F. Supp. 100, 105 (W.D.N.Y. 1995) ("[I]n order to ensure that a claimant" for social security disability benefits has a fair hearing, the decisionmaker "incurs a general obligation affirmatively to develop the record to ensure that all the necessary and relevant information is produced").

Further factual development is required here. On numerous occasions in the proceedings below, plaintiff requested that the ALJ order an additional consultative examination by, or testimony from, a cardiologist expert specifically because the other consultative experts who opined on plaintiff's RFC were seemingly unaware of plaintiff's second open-heart surgery. *See* R. 1940, 2217, 2219. The ALJ rejected these requests because she found it sufficient that the testifying medical expert had considered the February 2017 operative report, and noted that plaintiff "had the full opportunity to question [the expert] at th[e] hearing." R. 1941; *see also* R. 1912 ("The claimant's request for a medical expert is denied. There was a medical expert . . . called at the hearing held on March 13, 2019. The doctor reviewed Exhibit 4F along with the other evidence in the

20

file at that time and counsel had a full opportunity to examine the doctor."). But as the medical expert himself testified, his opinions were based (i) on a limited record, *see* R. 44 (testifying that he could not "find the documentation of the cardiac rehab" following plaintiff's second operation); R. 45 ("I do not have a documentation one year after the second surgery."); and (ii) on the opinions in the record from consultative experts who—as previously discussed—were unaware of the second surgery, *see* R. 42–43 (relying on consultative examination to opine that plaintiff's "post-operative recovery was . . . uneventful, and [plaintiff] recovered by the time of consultative examination").

For this reason, defendant's argument that additional records concerning the second emergency heart surgery "would be of negligible probative value" fails to move the needle. Cross-Mot. 18. Defendant argues that any gaps in the record related to plaintiff's second surgery would be harmless because other evidence indicated that plaintiff had recovered and was stable from his second surgery by, at the latest, July 2017. *See* Cross-Mot. 18; *see also* R. 48. And because the ALJ concluded that plaintiff "was very ill" beginning in October 2016, R. 1916, any records concerning plaintiff's symptoms in the intervening months would be of "negligible" value to the ALJ's overall disability determination. That is, because the ALJ concluded that plaintiff recovered by July 2017, plaintiff could not establish a continuous 12-month period of limitation for disability purposes regardless of his condition immediately after the second surgery, and thus "it is not relevant how limited [p]laintiff was during and after the hospitalizations[.]" Cross-Mot. 18.

But this argument fails to account for the fact that the ALJ was required to consider both medical evidence and plaintiff's "statements about the intensity, persistence, and limiting effects of [his] symptoms" in her disability determination. *Sabellico v. Comm'r*

21

*of Soc. Sec.*, No. 21-cv-02777, 2023 WL 6214214, at *5 (E.D.N.Y. Sep. 25, 2023). In doing so, the ALJ weighed the credibility of plaintiff's statements about his symptoms—including that he suffered severe chest pain for more than a year after his second surgery. *See* R. 33. The ALJ concluded that those statements were "not fully supported" by the record, R. 1916, a record that contained essentially no documentation concerning plaintiff's second heart surgery, and included the opinions of two consultative examiners who were unaware of an operation plaintiff underwent which the testifying medical examiner described as "very extensive, [and] life-threatening[.]" R. 50.

Indeed, the ALJ afforded one of the consultative examiner's opinions "great weight," R. 1918, even though his report suggests that he was unaware that plaintiff had an aborted, emergency heart-surgery a mere few weeks prior, *see* R. 606 (detailing plaintiff's "chief complaint" and past medical history but only referencing the "surgery on an infection in his valve done in November 2016"). In other words, the ALJ gave importance to a medical source opinion that "lack[ed] necessary information," *Sagman v. Comm'r of Soc. Sec.*, No. 20-cv-04257, 2021 WL 5831114, at *12 (S.D.N.Y. Dec. 8, 2021), and relied on that opinion to conclude that plaintiff's statements concerning his limiting symptoms were unsupported. Therefore, the lack of documentation about—and medical source opinion that accounted for—plaintiff's second emergency heart surgery amounts to a "clear gap" in the record which the ALJ was required to attempt to fill. *See Lewis v. Comm'r of Soc. Sec.*, No. 18-cv-06074, 2019 WL 5290936, at *6 (W.D.N.Y. Oct. 18, 2019) (finding that there was an "obvious gap" in the record where the claimant testified that he underwent back surgery, but the "ALJ mentioned the surgery only in passing," and "nevertheless concluded that the objective medical evidence [wa]s not consistent with [the claimant's] allegations of the severity of his symptoms of . . . pain"); *see also Colucci*

22

*v. Acting Comm'r of Soc. Sec.*, No. 19-cv-01412, 2021 WL 1209713, at *5 (E.D.N.Y. Mar. 31, 2021) ("[T]he ALJ must seek additional evidence or clarification when a report from a medical source contains a conflict or ambiguity, [or] lacks necessary information[.]"); *accord Mauro King v. Berryhill*, 251 F. Supp. 3d 438, 444 (N.D.N.Y. 2017) ("A consultative examiner's opinion may not constitute substantial evidence where the consultative examiner is not provided . . . the necessary background information.").

In sum, the Court finds that a more adequately developed record with respect to plaintiff's second emergency heart surgery is necessary to afford plaintiff a "full and fair hearing," and remand is warranted for further development of the factual record.[3] *Michelle C. v. Comm'r of Soc. Sec.*, No. 23-cv-07144, 2024 WL 1706000, at *6 (S.D.N.Y. Apr. 3, 2024), *report and recommendation adopted*, 2024 WL 1702127 (Apr. 18, 2024); *see also Tucker v. Bowen*, No. 87-cv-03487, 1989 WL 10564, at *4 (E.D.N.Y. Feb. 2, 1989) ("The ALJ's affirmative duty to develop the record requires him to obtain the claimant's medical records and other relevant evidence where, as here, such evidence is necessary to a fair determination of the claim.").

### B.  Credibility Inquiry Standard

Remand is also warranted on the separate ground that the ALJ failed to apply the correct legal standard when assessing plaintiff's credibility. When determining a

---

[3]    To the extent the parties raise other disputes, including whether (1) the ALJ properly evaluated the medical opinion evidence, Mot. 16–22; (2) whether the ALJ's RFC finding was supported by substantial evidence, Mot. 22–25; and (3) whether the ALJ erred in relying on the vocational expert's testimony, Mot. 25–29, the "ALJ's failure to develop the record is a threshold problem," and thus the Court declines to address these issues in the absence of a more fulsome factual record. *See Santoro*, 703 F. Supp. 3d at 390 (explaining that "the gap in the record le[ft] the [c]ourt unable to resolve" issues raised by the parties, including "whether the ALJ's RFC finding was supported by substantial evidence" because that finding "was made on an incomplete record").

claimant's RFC, the ALJ "is required to take the claimant's reports of pain and other limitations into account." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 416.929). The ALJ need not "accept the claimant's subjective complaints without question; [s]he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Id.* SSA regulations provide for a two-step process to assess the credibility of a claimant's testimony. First, the ALJ determines whether the claimant's impairment "could reasonably be expected to produce the symptoms alleged"; second, the ALJ determines whether and to what extent the claimant's reported symptoms "can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." *Colombia B.N. v. Comm'r of Soc. Sec.*, No. 21-cv-10622, 2023 WL 358599, at *5–6 (S.D.N.Y. Jan. 23, 2023). If a claimant provides testimony concerning his symptoms that "is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony." *Jaeckel v. Colvin*, No. 13-cv-04270, 2015 WL 5316335, at *9 (E.D.N.Y. Sep. 11, 2025).

Specifically, the ALJ must consider the factors set forth in 20 C.F.R. § 404.1529(c)(3)(i)–(vii), including: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of medications taken to address the pain; (5) the treatment, other than medication, that the claimant has received; (6) other measures that the claimant uses to alleviate the pain; and (7) other factors concerning the claimant's limitations and restrictions as a result of the pain. *See Meadors v. Astrue*, 370 F. App'x 179, 184 n.1 (2d Cir. 2010) (summary order); *see also Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 435 (S.D.N.Y. 2010).

If, after considering the objective medical evidence and relevant credibility factors, an ALJ finds that a claimant's testimony is not credible, "[s]he must explain that decision with sufficient specificity to permit a reviewing court to decide whether there are legitimate reasons for the ALJ's disbelief." *Romanelli v. Astrue*, No. 11-cv-04908, 2013 WL 1232341, at *11 (E.D.N.Y. Mar. 26, 2013); *see also Castel*, 2020 WL 5775668, at *13 ("To the extent the ALJ determines that the claimant's statements are not supported by the medical record, however, the ALJ's decision must include specific reasons for the weight given to the individual's symptoms, . . . and the reasons must be clearly articulated[.]"). In other words, an ALJ must clearly articulate "the reasons for any discounting of [a claimant's] statements" concerning their symptoms. *Castel*, 2020 WL 5775668, at *20.

Although an ALJ is not required to "explicitly examine all seven [credibility] factors," an ALJ's credibility determination must contain a sufficiently "thorough explanation" such that a reviewing court may "glean" their rationale. *Travis M. v. Comm'r of Soc. Sec. Admin.*, No. 24-cv-07341, 2025 WL 2157840, at *9 (S.D.N.Y. July 30, 2025). Still, an ALJ is "required to consider" relevant credibility factors listed in 20 C.F.R. § 404.1529(c)(3) when conducting a credibility inquiry, and her decision must "explain how she balanced those factors." *Adesina v. Astrue*, No. 12-cv-03184, 2014 WL 5380938, at *13 (E.D.N.Y. Oct. 22, 2014) ("When conducting a credibility inquiry, the ALJ is required to consider all of the factors listed in 20 C.F.R. § 404.1529(c)(3) and explain how she balanced those factors."); *cf. Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (summary order) (concluding that the failure to discuss "those [credibility] factors not relevant to [a claimant's] credibility determination" did not require remand). Where an ALJ "insufficiently applies the credibility factors" or where an ALJ's credibility analysis

25

"fails to refer to or discuss the factors," remand is appropriate. *Travis*, 2025 WL 2157840, at \*9; *see also Monroe v. Astrue*, No. 12-cv-01456, 2014 WL 3756351, at \*6–7 (E.D.N.Y. July 30, 2014).

Plaintiff argues that the ALJ erred at the second step of the credibility analysis because she failed to address the credibility factors. Mot. 10. Plaintiff also argues that in lieu of articulating specific reasons why she discounted plaintiff's statements concerning his symptoms, the ALJ provided mere conclusory statements in support of her decision. *See* Mot. 12. Defendant does not address whether the ALJ erred in failing to discuss the credibility factors. *See* Cross-Mot. 11. Instead, defendant argues that the ALJ "must only identify record-based reasons for [her] conclusion" as to whether claimant's allegations about his symptoms were false or otherwise contradicted by the record. Cross-Mot. 11. And in defendant's view, the ALJ did so here by considering plaintiff's "contemporaneous reports to his doctors and his activities of daily living" in concluding that his allegations concerning his disabling symptoms were contradicted by the record. Cross-Mot. 11.

The Court finds that the ALJ erred at the second step of the credibility analysis by insufficiently applying and balancing the credibility factors. The ALJ concluded that plaintiff's "statements about the intensity, persistence, and limiting effects of his symptoms, [were] inconsistent because they [we]re not fully supported by the medical evidence." R. 1916. In doing so, the ALJ was required to "weigh the credibility of [plaintiff's] testimony regarding the severity of [his] symptoms in light of [the] seven [credibility] factors." *Peña v. Astrue*, No. 08-cv-03304, 2011 WL 2847438, at \*2 (E.D.N.Y. June 22, 2011), *report and recommendation adopted*, 2011 WL 2837409 (July 13, 2011). And to the extent that the ALJ did not expressly examine each factor, she was required to at least examine and balance any relevant factors and provide a sufficiently thorough

26

explanation such that the Court could glean her rationale. *See Cichocki*, 534 F. App'x at 76.

The ALJ failed to do so here. At the beginning of her analysis, the ALJ stated that if she found plaintiff's statements concerning his pain or other symptoms were not substantiated by objective medical evidence then she must "consider other evidence in the record to determine if [plaintiff's] symptoms limit the ability to do work-related activities." R. 1915. The ALJ then went on to recite plaintiff's medical history and various medical opinions in the record. *See* R. 1916–19. Nowhere in this discussion did the ALJ explain how—or whether—this "other evidence in the record" corresponded with the credibility factors set forth in 20 C.F.R. § 404.1529(c)(3). *See* R. 1915; *see also Romanelli*, 2013 WL 1232341, at *11 ("Here, while the ALJ recited various medical evidence, including [the] [p]laintiff's limited daily activities and [the] [p]laintiff's description of dizziness, headaches, and coughing, he provided no analysis as to how these items—or any other 20 C.F.R. § 404.1529(c)(3) factors—led to his conclusory statement that [the] [p]laintiff's testimony concerning the intensity and limiting effects of her condition was not credible."); *see also Adesina*, 2014 WL 5380938, at *13 (concluding that the ALJ "erred in exclusively relying upon her reading of objective medical evidence to reject [the] [p]laintiff's assertions regarding her symptoms," because "[w]hen conducting a credibility inquiry, the ALJ is required to consider all of the factors listed in 20 C.F.R. § 404.1529(c)(3)"); *Simone v. Astrue*, No. 08-cv-04884, 2009 WL 2992305, at *11 (E.D.N.Y. Sep. 16, 2009) (explaining that remand was required where the ALJ "did not offer any analysis of the factors prescribed for evaluating subjective pain, and instead relied simply on the lack of objective evidence to discredit [the] plaintiff['s] claims regarding his symptoms").

27

Indeed, the only credibility factor that the ALJ expressly referenced in her analysis was plaintiff's daily activities of living. *See* R. 1916 ("The claimant's allegations are also not fully in line with the claimant's reported activities of daily living."). Aside from tangential discussion about the frequency of certain of plaintiff's reported symptoms and medications he used to treat those symptoms, *see* R. 1917, the ALJ's analysis was otherwise devoid of specific reference to, or analysis of, the other credibility factors and instead relied on plaintiff's medical history and medical opinions in the record to support the conclusion that plaintiff's statements concerning the limiting effects of his symptoms were not entirely credible. *See* R. 1916–19. But this analysis is inadequate because SSA regulations recognize "the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone." *Correale-Englehart*, 687 F. Supp. 2d at 435 n.58. Thus, the purpose of the credibility factors is to outline "the kinds of evidence that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements." *Id.*

Plaintiff's case illustrates this point. During the March 2019 hearing, plaintiff testified that following his heart surgeries he suffered from significant chest pain up to around March 2018. *See* R. 32–34; Joint Stip. ¶ 48.[4] Specifically, plaintiff testified that the pain from the incision point "was at a 10" out of 10 severity. R. 33. Moreover, doctors

---

[4]      Defendant raises the point that plaintiff's allegations of severe chest pain was "a claim solely made during the March 2019 hearing[.]" Cross-Mot. 12. But this argument is unavailing because (1) an ALJ "must consider the entire record," when "evaluating the intensity and persistence of the claimant's symptoms," *Davis v. Colvin*, No. 15-cv-01327, 2016 WL 5334648, at *3 (D. Conn. Sept. 21, 2016); and (2) the ALJ considered other testimony from that hearing in making her credibility assessment—testimony from the independent medical expert, Dr. Jilhewar, *see* R. 1918.

prescribed plaintiff oxycodone to treat discomfort he felt in the aftermath of the procedure. Joint Stip. ¶ 12 n.20. Although this evidence could have suggested a more severe level of impairment than indicated by plaintiff's medical history, the Court cannot discern how—or if—the ALJ weighed this evidence in determining plaintiff's credibility in light of the lack of analysis with respect to the credibility factors. *See Simone*, 2009 WL 2992305, at *11 (concluding that the ALJ "did not properly evaluate [the] plaintiff's credibility" even where the ALJ "listed the factors given in 20 C.F.R. 404.1529(c)(3)" because the ALJ "did not analyze those factors or incorporate them into his analysis"). In other words, "[i]n making h[er] determination about plaintiff's credibility, it is not clear that the ALJ took into account the factors listed in 20 C.F.R. § 404.1529(c)(3) other than plaintiff's daily activities as the regulations and caselaw require." *Jaeckel*, 2015 WL 5316335, at *11 (remanding where "the ALJ summarized plaintiff's testimony, various medical evidence, and some of plaintiff's activities of daily living, [because] the ALJ did not explain which factors, other than certain of [the] claimant's admitted activities, he evaluated in determining that [the] claimant's statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible"); *see also Travis*, 2025 WL 2157840, at *9 ("[M]erely reciting [p]laintiff's medical history, even with a limited review of the specified factors, falls short of a proper credibility analysis.").

Defendant's argument that substantial evidence supports the "ALJ's conclusion that [p]laintiff's subjective claims were not consistent with the record," Cross-Mot. 12, misses the mark. Whether the ALJ considered and applied the 20 C.F.R. § 404.1529(c)(3) factors relates to application of a legal standard. *See Monroe*, 2014 WL 3756351, at *7 ("By failing to consider and discuss all applicable factors set forth in 20 C.F.R. § 404.1529(c)(3) when making her credibility inquiry, the ALJ committed legal error.");

*Felder v. Astrue,* No. 10-cv-05747, 2012 WL 3993594, at *15 (E.D.N.Y. Sept. 11, 2012) (same); *Jaeckel,* 2015 WL 5316335, at *11 (same). Indeed, it may ultimately be the case that substantial evidence supports the ALJ's conclusion that plaintiff's statements concerning the limiting effects of his symptoms are not entirely credible. Still, on remand the ALJ must reach that conclusion with sufficient consideration and reference to the factors set forth by SSA regulations. *See Travis,* 2025 WL 2157840, at *11 (ordering remand because the ALJ failed to "provide an adequate explanation for discounting [the] [p]laintiff's subjective testimony," and noting that it was "possible that the ALJ would reach the same conclusion on remand, but any new credibility determination should address [the] [p]laintiff's testimony more specifically with reference to the factors outlined in 20 C.F.R. § 404.1529(c)(3)"); *accord Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis [to] doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have h[is] disability determination made according to the correct legal principles.").

Finally, the Court notes that to the extent the ALJ considered relevant credibility factors in weighing plaintiff's statements concerning his symptoms, remand is still warranted because the ALJ's decision failed to explain how she balanced those factors. *See Monroe,* 2014 WL 3756351, at *6 (ordering remand where the ALJ "consider[ed] [the] [p]laintiff's daily activities, some of his pain and symptoms, and the side effects of his medications," because the ALJ "failed to indicate how she balanced those factors"); *Simone,* 2009 WL 2992305, at * 11 (ordering remand even where the "ALJ properly listed the factors given in 20 C.F.R. 404.1529(c)(3)" because the ALJ "did not identify what facts

30

he found to be significant, indicate how he balanced the various factors, or specify which of [the] plaintiff's alleged symptoms he found to be not credible[,] [but] [i]nstead . . . devoted his analysis to his erroneous conclusion that there was a lack of objective evidence supporting plaintiff's claims").

In short, the record is unclear as to whether the ALJ "meaningfully consider[ed] the full range of § 404.1529(c)(3) factors." *Adesina*, 2014 WL 5380938, at *13. Therefore, remand is warranted. *See Grosse v. Comm'r of Soc. Sec.*, No. 08-cv-04137, 2011 WL 128565, at *5 (E.D.N.Y. Jan. 14, 2011) (finding that the ALJ committed legal error and ordering remand because the ALJ failed to consider credibility factors two through seven). On remand, to the extent that the ALJ "determines that any of claimant's statements are inconsistent with medical evidence in the record, the ALJ should specify the statements and the evidence in the record, and explain why [s]he chooses to discredit the statements with reference to the applicable regulatory factors." *Jaeckel*, 2015 WL 5316335, at *11; *see also Adesina*, 2014 WL 5380938, at *14 ("On remand, the ALJ must explicitly discuss each of the seven factors before rejecting [the] [p]laintiff's credibility.").

## CONCLUSION

For the reasons stated above, plaintiff's motion for judgment on the pleadings is **GRANTED**, and the Commissioner's cross-motion is **DENIED**. This action is **REMANDED** for further proceedings consistent with this Order. The Clerk of Court is respectfully directed to enter judgment and close this case.

**SO ORDERED.**

_/s/ Natasha C. Merle_
NATASHA C. MERLE
United States District Judge

Dated:        February 20, 2026
              Brooklyn, New York